IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 30, 2019 Session

**STATE OF TENNESSEE v. OSEI SORRELL**

**Appeal from the Criminal Court for Hamilton County**
**No. 297181      Don W. Poole, Judge**

**No. E2018-00831-CCA-R3-CD**

A Hamilton County jury convicted the Defendant, Osei Sorrell, of attempted second degree murder, aggravated assault, and reckless endangerment. The trial court dismissed the aggravated assault conviction in its capacity as 13th juror and imposed an effective nine-year sentence for the remaining convictions. The Defendant raises the following issues on appeal: (1) the jury venire did not represent a cross-section of Hamilton County; (2) the trial court erred when it denied his motion for new trial based on newly discovered evidence that would have resulted in a different verdict; (3) the trial court erred in declaring the victim unavailable to testify; (4) the trial court erred when it limited the proof of the victim's gang affiliation; (5) Agent Hudson was not qualified as an expert on firearms identification; and (6) the trial court erred when it allowed the victim's prior out of court identification of the Defendant as the shooter to be admitted. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, P.J. and ROBERT L. HOLLOWAY, JR., J., joined.

Joshua P. Weiss, Chattanooga, Tennessee for the appellant, Osei Sorrell.

Herbert H. Slattery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; W. Neal Pinkston, District Attorney General; and Phillip Andrew Coyle, Assistant District Attorney General for the appellee, State of Tennessee.

**OPINION**

This case arises from the Defendant shooting the victim, Kadarius Johnson, while driving in downtown Chattanooga, Tennessee. For this offense, a Hamilton County grand jury indicted the Defendant for attempted first degree premeditated murder, aggravated

assault, and reckless endangerment.

## I. Facts
## A. Pretrial

Prior to trial, the Defendant filed a motion to suppress evidence seized during the stop of the Defendant's vehicle following the shooting. In concert, he filed a motion in limine to exclude ballistics evidence and a notice of intent to introduce evidence of the victim's gang affiliation. The Defendant later filed a notice of intent to introduce evidence of an alternate perpetrator. These matters were adjudicated at hearings held on July 10 and August 3, 2017.

### 1. July 10 Hearing

The following evidence was presented at the July 10 hearing: Sergeant John Luquer testified that he was employed by the Chattanooga Police Department ("CPD") and was working in downtown Chattanooga on September 23, 2015. On that evening, Sergeant Luquer heard, through police dispatch, a "Be on the Lookout" ("BOLO") for a white SUV with large rims. The vehicle had been observed by witnesses chasing another vehicle and shooting at it. Sergeant Luquer patrolled the area where the vehicle was last seen, and, while sitting at a traffic light, he saw a white SUV drive by with "noticeably big" rims, consistent with the BOLO. Sergeant Luquer initiated a stop of the white SUV; the Defendant was the sole occupant of the vehicle. The Defendant denied having shot at another vehicle and denied possession of any weapons. Sergeant Luquer described the Defendant as polite and cooperative. The Defendant consented to a search of his vehicle, which revealed two ammunition magazines, cash, and a semi-automatic pistol.

Sergeant Luquer described the semi-automatic pistol as being inside the "engine firewall" that separated the passenger compartment from the engine compartment, under the brake and gas pedal. During the traffic stop, another individual arrived at the scene and identified himself as a witness to the earlier shooting. Sergeant Luquer testified that his patrol car was equipped with a dashboard camera and that it recorded the stop of the Defendant's vehicle, albeit without audio. The video was played in open court.

On cross-examination, Sergeant Luquer testified that he had provided a copy of the video from his dashboard camera to the defense, but the original video no longer existed. He agreed that the footage in the video copy was "sped up," due to the original version's length. Sergeant Luquer stated that he pulled over the Defendant's vehicle solely based on the BOLO description and not because he witnessed a traffic infraction or knew of the Defendant's prior conduct. Sergeant Luquer reiterated that the Defendant agreed to a search of his vehicle but that he never told the Defendant he could refuse. Sergeant

2

Luquer testified that he ceased all communication with the Defendant after he placed the Defendant in handcuffs. He testified that he did not remember the Defendant's vehicle smelling like gun powder residue.

Detective Jeff Hamilton testified that he responded to the hospital where the victim was being treated. The victim told officers that he had been shot by a "fat black guy with dreads." Detective Hamilton testified that the victim did not make an identification of the Defendant, either in-person or from photographs.

The trial court heard arguments from the parties on the issue of ballistics testing of the firearm found in the Defendant's vehicle. The Defendant requested independent testing of the firearm by a third-party expert, which the State agreed to, but the parties could not agree on how to deliver the firearm to the Defendant's out-of-state expert. The trial court withheld judgment pending a later hearing.

The trial court issued an order denying the Defendant's motion to suppress, stating the following:

> The totality of the circumstances including the fact that the [D]efendant's vehicle matched the description of the shooter's distinctive SUV, was in the area toward which the shooter's SUV was traveling across the bridge, the officer observed and stopped the vehicle within ten minutes of receiving the alert, and the shooting had occurred recently, as the shooter's SUV was crossing the bridge, was sufficient to establish reasonable suspicion to conduct an investigatory stop to determine whether an occupant of the vehicle was the shooter. The Court therefore finds nothing unreasonable in the initial stop in this respect.

> The [D]efendant also contends that the initial stop was in effect an arrest. The Court respectfully disagrees. During lawful traffic stops, officers may routinely require motorists to exit their vehicles for reasons of officer safety, absent circumstances that render the scope or prolongation of the stop unreasonable. *State v. Donaldson*, 380 S.W.3d 86, 92-4 (Tenn. 2012) (citations, footnotes omitted).

> If there was reason to suspect the [D]efendant of being the shooter and stop him, which there was, then there was reason to suspect him of being armed and take the precaution of removing him from his vehicle and frisking him before proceeding with the investigation. The Court therefore finds nothing unreasonable in the initial stop in this respect.

3

The [D]efendant also contends that the search of the vehicle was unreasonable. The Court respectfully disagrees. Consent is an exception to the warrant requirement.

In this case, there is evidence that the [D]efendant consented to let the officer look in his vehicle after having been lawfully stopped, frisked, and questioned and there is no evidence that he did so involuntarily or as a result of a prior illegality. The Court therefore finds nothing unreasonable about the search of the vehicle.

The [D]efendant finally contends that the length of the stop was unreasonable. The Court respectfully disagrees. . . . . In this case, the officer's request for consent to search the vehicle did not expand or unreasonably prolong the stop but was part of the same investigation as his prior questions about whether the [D]efendant had a gun or had been shooting at anyone. The investigation began and continued as an investigation of gunshots fired from one moving vehicle at another moving vehicle. When the [D]efendant denied having a gun or shooting at anyone, his credibility became an issue and it was reasonable for the officer to continue the investigation by requesting consent to search and search the vehicle to resolve that issue. The Court therefore finds nothing unreasonable in the length of the stop.

## 2. August 3 Hearing

The Defendant made an offer of proof regarding the victim's gang affiliation. Prior to the presentation of evidence, the Defendant's attorney asserted that the shooting in the present case was part of a "gang war" and that the victim was a verified "Rollin 20s Crip." He alleged that the victim had been involved in this ongoing gang war and that a rival gang member shot the victim, as opposed to the Defendant who was not a member of a gang. The Defendant called Investigator Curtis Penney, who testified that he was familiar with the gangs in the Chattanooga area. Specifically, he testified that the Rollin 20s Crip gang was a violent organization involved in prior shootings and murders. The Rollin 20s Crip gang was in dispute with another gang, the Bounty Hunter Bloods. Investigator Penney testified that the victim, Kadarius Johnson, was a validated member of the Rollin 20s Crip gang, based on the CPD's gang validation assessment form. He testified that the victim had been involved in violent incidents and was a criminal. Investigator Penney testified that he was familiar with the Defendant and had no reason to believe the Defendant was involved in a gang. Investigator Penney declined to speculate whether the victim's shooting was a gang retaliation shooting.

4

Detective Zack Crawford testified that he worked for the CPD and was familiar with the victim. He recalled that, in November of 2015, six weeks after the shooting in this case, the victim went to a woman's house looking to fight the woman's son. The victim was seen brandishing a weapon by the woman and her family. The victim was later arrested on an aggravated assault warrant.

The trial court concluded that the evidence proffered by the Defendant was speculative and did not prove retaliation on the part of a third party as the alternate theory of defense. The trial court concluded that the Defendant would not be able to introduce evidence to show that the victim was affiliated with a gang in order to show that the shooting was retaliatory.

### 3. Voir Dire

During voir dire, the Defendant objected to the demographic of the jury venire, stating that he was entitled to a jury comprised of a cross-section of his community. The Defendant took issue with the fact that not a single black male was present in the jury venire when the City of Chattanooga was, he contended, approximately thirty percent black. The Defendant also objected that there were few if any potential jurors from the Defendant's zip code. The trial court overruled the motion, stating that it was untimely.

### B. Trial

At the Defendant's trial on these charges, the parties presented the following evidence: Sergeant John Luquer testified consistently with his pretrial testimony, stating that he saw the white SUV with large rims described in a BOLO, and he stopped the vehicle. The sergeant asked the Defendant, who was the sole occupant of the vehicle, to step out of the vehicle, and the Defendant complied. The Defendant denied having any weapons but consented when Sergeant Luquer asked if he could "check" the Defendant's vehicle. Inside the Defendant's vehicle, officers found two ammunition magazines of different calibers in the center console and some $100 bills. The Defendant again denied having a weapon in the vehicle. A further search of the vehicle revealed a semi-automatic weapon under the driver's steering console. At this point, officers placed the Defendant under arrest. While waiting to transport the Defendant, an individual came to the scene of the Defendant's arrest and stated that he had witnessed the shooting incident.

On cross-examination, Sergeant Luquer testified that, while he was searching the Defendant's vehicle, a call came over the dispatch radio that a man had been found shot in the head in north Chattanooga.

5

Calvin Kidd, a college student, testified that he was playing Frisbee in a park on the corner of Third Street in the downtown Chattanooga area at around 9:00 p.m. when he saw a large white SUV with large chrome rims pursuing a smaller sedan. The roar of the vehicles' engines attracted his attention, and then he saw the muzzle flash of a gunshot and heard three to five gunshots coming from the white SUV. Mr. Kidd testified that the driver's side window, from where the shots originated, was down. Mr. Kidd left the park and later saw the white SUV pulled over on Third Street by the police; out of "civic obligation" Mr. Kidd stopped and reported to the police what he had seen. Mr. Kidd testified that he was "certain" it was the same vehicle he had witnessed during the shooting, based on its "make, model, . . . same general features, same wheels," which he described as "big chrome rims." Mr. Kidd identified a photograph of the Defendant's vehicle as the one involved in the shooting.

On cross-examination, Mr. Kidd clarified that he had seen a gun coming out of the front driver's side window of the white SUV.

Seth Albright testified that he was driving in downtown Chattanooga on East Third Street when he observed two vehicles speed through an intersection; the second vehicle was shooting at the first. He described the first vehicle as a small sedan and the second vehicle as a white SUV. Mr. Albright saw two people in the white SUV, the driver and a passenger in the backseat. Mr. Albright observed the passenger's hand out the window, holding a rifle, and he heard four shots fired. Mr. Albright identified the weapon as a rifle, consistent with an AR-15.

Following this testimony, outside the presence of the jury, in order to procure the victim's attendance at the trial, the trial court signed the State's application for a bench warrant for the victim and set his bond at $5,000.

Phani Tangirala testified that he was riding in a vehicle in downtown Chattanooga on East Third Street on the night of September 23, 2015. Mr. Tangirala heard at least three gunshots and saw a white SUV pursuing a sedan. He called the police immediately. Mr. Tangirala described the white SUV as being driven recklessly, given that there were other cars on the road. He recalled that this occurred at approximately 6:30 p.m. Other witnesses testified to hearing as many as six gunshots and that the white SUV had tinted windows.

Jerry McElroy, a CPD crime scene investigator, testified that he was contacted by CPD dispatch with a report of a shooting victim at the emergency room. He also learned of a vehicle, a Buick, which police had found in North Chattanooga on Wert Street that they believed was involved in the shooting. Investigator McElroy responded to where the Buick was found; it was parked in the yard of a residence on Wert Street, and he began

6

photographing it and collecting evidence. The rear window of the vehicle was shattered and a red substance was on the back of the driver's seat.

Investigator McElroy then responded to where the Defendant's vehicle had been stopped by Sergeant Luquer on Fourth Street. He observed a .22 caliber semi-automatic pistol on the hood of Sergeant Luquer's vehicle that had been found inside the Defendant's vehicle. Lying next to the weapon were ammunition magazines with live ammunition inside. Investigator McElroy indicated that the ammunition was also .22 caliber. He noticed that the Defendant's vehicle had "aftermarket stylish wheels" and tinted windows. Investigator McElroy found a live bullet in the center console of the white SUV, a .40 caliber Smith & Wesson round. He also collected two additional ammunition magazines for a pistol: one for a "Kel-Tec" and one for a "Glock."

Investigator McElroy testified that, when he processed the Defendant into the system following his arrest, he used a kit to test the Defendant's hands for gunshot residue as well as obtained a DNA sample from the Defendant. The next day, Investigator McElroy processed the Defendant's white SUV, the gunshot residue kit and the DNA samples. He also lifted several fingerprints from the white SUV, one of which was matched to the Defendant. Inside the Defendant's white SUV, Investigator McElroy found a live round of ammunition and two pistol magazines.

Investigator McElroy then processed the Buick and found the victim's Tennessee ID card. He also performed a gunshot residue test on the vehicle and swabbed the red substance found on the driver's seat. On the passenger's side of the Buick, Investigator McElroy found a fragment of the tip of a bullet.

On cross-examination, Investigator McElroy testified that he collected DNA samples from all the door handles of the Buick and the Defendant's white SUV. He agreed that he did not find any spent shell casings in the Defendant's vehicle, only live rounds of ammunition. He clarified that the .40 caliber magazine found in the center console of the white SUV was empty and that another magazine, for a .22 caliber Kel-Tec pistol, contained 21 rounds of live ammunition.

James Davis, an employee of the TBI, testified that he analyzed the results of the gunshot residue test performed on the Defendant's hands and his vehicle; Mr. Davis did not find gunshot residue on the Defendant's hands but he found gunshot residue on the driver's side door of the Defendant's vehicle. He also found residue on the front passenger side door.

At this point, the jury was excused from the courtroom for a hearing on the availability of the victim. The State indicated that it had served the victim with a

7

subpoena and that he had refused to comply.   The State moved to have the victim declared unavailable pursuant to Tennessee Rule of Evidence 804 and asked to play a recording of the victim's preliminary hearing testimony.

The following evidence was presented on the issue of the victim's unavailability: Lisa Mathis testified that she was an investigator for the District Attorney's office and had personally served the victim with a subpoena at the probation office.   Ms. Mathis had also spoken with the victim by telephone, left him voicemails, spoken to the victim's mother and girlfriend, both of whom relayed Ms. Mathis's message to the victim that he was expected in court.   Ms. Mathis stated that she had called the victim a total of five times.

On cross-examination, Ms. Mathis testified that she had gone to the victim's residence in an attempt to locate him.   Ms. Mathis stated that when she had spoken to the victim on the telephone, he indicated to her that he would not be coming to court because he did not want to be labeled as a "snitch."

Tim Pickard testified that he worked for the CPD and was asked by the District Attorney for help locating the victim.   Officer Pickard checked the criminal justice database and obtained several addresses for the victim which he then visited.   The victim was not at any of the locations.   Officer Pickard contacted the victim's mother, and she stated that the victim was scared to come to court and in fear for his life.   Eventually, Officer Pickard made contact with the victim by phone, and the victim indicated he would not come to court because he feared for his life.   In the following days, Officer Pickard or another member of law enforcement drove by several locations where the victim was listed as residing.

On cross-examination, Officer Pickard stated that he believed there was an outstanding bench warrant for the victim's arrest.

Sherry Bradford testified that she was the victim-witness coordinator for the District Attorney's office and had attempted to contact the victim and to arrange transportation for him to court.   She spoke with the victim on the telephone, and he asked her to send a car to pick him up for court.   The victim hung up the phone before Ms. Bradford could get his address, and he did not answer subsequent telephone calls.

On cross-examination, Ms. Bradford recalled that several subpoenas were sent to facilities where the victim was incarcerated for other offenses and before this trial began. She had no personal knowledge of whether the subpoenas were actually served on the victim.   Ms. Bradford clarified that she had spoken to the victim the day before she appeared in court for the current trial and that was when he asked her to send a car to pick him up.

At the conclusion of the hearing on the victim's unavailability, the trial court stated that it had listened to all the evidence about the various attempts to serve the victim with a subpoena by Ms. Mathis, Investigator Pickard, Ms. Bradford, and other law enforcement. Based on this, the trial court concluded that there was "overwhelming evidence" that "every effort in the world" had been made by the State to procure the victim in court. The trial court found that the victim was unavailable, consistent with the requirements of the hearsay exception found at Tennessee Rule of Evidence 804.

Pursuant to Rule 804(b)(1), the State sought to introduce a recording of the victim's testimony from the preliminary hearing, at which the Defendant was represented by counsel who had an opportunity to question the victim while he was under oath. The trial court found that the victim's preliminary hearing testimony was admissible because (1) the victim had been declared unavailable; (2) the prior testimony had been given at a proceeding where the victim was subject to cross-examination under oath; and (3) the motive of the questioning of the victim at the prior proceeding was the same. The trial court noted that the Defendant objected specifically to the third element, that the motive at the preliminary hearing was the same. Particularly, the Defendant alleged that, at the preliminary hearing, discovery had not been provided by the State and thus defense counsel had not had the opportunity to meaningfully investigate the case prior to the preliminary hearing. Based on the information gleaned from the discovery materials furnished after the preliminary hearing, the Defendant argued that his motive to cross-examine the victim had changed. The Defendant argued that, at the preliminary hearing, the victim had been arrested approximately two times; by the time of trial, the victim allegedly had been arrested six more times, one time in connection to an alleged drive-by shooting. The Defendant indicated that he wanted to cross-examine the victim about his arrests. Lastly, the Defendant argued that he was denied the opportunity to cross-examine the victim about his prior statements to police.

After hearing argument, the trial court, pursuant to Rule 804, allowed admission of the victim's prior testimony, and the State played the recording for the jury. In the recording, the victim testified that he was shot in the head in September 2015 in Chattanooga. The bullet was later removed from behind his right ear. The victim testified that he was driving a Buick when he saw a white SUV pull up behind him. A man got out of the SUV and shot him. The victim did not know the man but described him as "black." The victim recalled that the man fired two shots, one of which hit him. The victim's car window was also shot out. The victim drove away while the man continued to shoot at him. The victim recalled that the white SUV had rims on it. The victim drove to another part of town and left his Buick to be picked up by his girlfriend. The victim later went to the hospital to have the bullet removed from his neck. He testified that his brain was bleeding. The victim testified that he was interviewed by the police at the

9

hospital.   He denied knowing the Defendant.

On cross-examination, the victim testified to the events leading up to the shooting. He stated that he was walking home from a community center when he saw a white SUV drive by.   The victim walked to his car and sat inside it; while it remained parked, the white SUV pulled up behind his vehicle.   The person driving the white SUV got out of the vehicle and shot him.   He described the shooter as black and the vehicle as a white SUV with full rims.   The victim drove away and the white SUV followed, shooting at the victim while he drove through downtown Chattanooga.

Jared Hamilton testified that he was a homicide investigator for the CPD and responded to the hospital to interview the victim.   Investigator Hamilton recalled that doctors were pulling a bullet "out of [the victim's skull]" when he arrived.   Shortly after the removal, Investigator Hamilton conducted a recorded interview with the victim. Based on the victim's description of the shooter and the shooter's vehicle, a BOLO was issued for the vehicle.   Investigator Hamilton left the hospital and heard over the dispatch radio that a vehicle matching the BOLO description had been pulled over.   Investigator Hamilton responded to the vehicle's location and assisted with the transport of the Defendant who he later interviewed.   Portions of the Defendant's recorded interview were played for the jury.   In the interview, the Defendant admitted to Investigator Hamilton that he had a Kel-Tec pistol in his vehicle but had forgotten about it, which was why he did not reveal its presence when he was stopped.   He stated that he had a permit for the pistol.   He stated that the pistol used .22 caliber ammunition.   He also admitted to having several ammunition magazines in the vehicle.   The Defendant denied knowing the victim or shooting at his vehicle.

On cross-examination, Investigator Hamilton testified that he interviewed the victim several days after the shooting, when the victim had been released from the hospital. He testified that he did not procure video footage from the many security cameras present in downtown Chattanooga that would have captured the shooting on video.   He also testified that he did not arrange for the victim to be shown a photographic lineup. Investigator Hamilton agreed that multiple reports were taken of the shooting and that the reports were inconsistent as to the location of the shooting and the description of the vehicles involved.   He agreed that witnesses were never shown pictures of the Defendant's vehicle for identification.   He agreed that generally there were many white SUV's with rims in the area.

At this point, the trial court addressed the Defendant's request to introduce evidence of an alternate perpetrator related to the victim's gang affiliation.   The trial court stated that the Defendant's theory that the shooting was part of ongoing gang warfare remained purely speculative and, until evidence was presented otherwise, the trial court would not

allow questions regarding this theory.

The Defendant sought to exclude the testimony of TBI employee Jessica Hudson on the grounds that she was unqualified to testify as an expert. Outside the presence of the jury, TBI Agent Jessica Hudson testified that she worked as a forensic scientist. She clarified that she did not work in the area of ballistics. Agent Hudson testified that she was trained to examine clothing, but not hand swabs, for gunshot residue. She testified that she had an undergraduate degree in biology and no higher education beyond the college level. Agent Hudson testified that she was not certified in the field of firearm and tool mark examination but that she had received training in the field. Agent Hudson testified that she had been qualified to testify as an expert eleven times previously. Agent Hudson testified to the various procedures and examination protocols in the field of firearm and tool markings used when determining, for example, whether a certain bullet was fired from a certain weapon. Agent Hudson stated that she took proficiency tests four times per year in this field.

As to the evidence recovered in the present case, Agent Hudson testified that there were no distinguishable markings on the bullet taken out of the back of the victim's head. A second fragment found in the victim's vehicle was similarly indistinguishable, meaning Agent Hudson could not say if the fragments had been fired from the same weapon. As to a shell casing found on Third Street, Agent Hudson testified that she was certain it had come from the Defendant's pistol. Agent Hudson agreed that her area of expertise was a "very subjective science" that was often criticized.

Based on this testimony, the Defendant moved to exclude Agent Hudson's testimony relevant to firearm identification. The trial court found that Agent Hudson was qualified as an expert "by reason of experience" based on her many trainings and history testifying in her field. Pursuant to Tennessee Rule of Evidence 702 (stating that "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise"), the trial court found that Agent Hudson was qualified as an expert.

In the presence of the jury, Investigator Hamilton was recalled to testify. He stated that the description of the shooter given by the victim while in the hospital was "a heavyset black man with dreads." On recross-examination, Investigator Hamilton agreed that he interviewed the victim twice in the aftermath of the shooting and that his statements were inconsistent and contradictory. Investigator Hamilton agreed that the Defendant did not have a violent criminal history.

Agent Hudson testified as an expert witness in the field of firearm identification.

11

She testified that she prepared a firearms report of her examination of the Kel-Tec pistol and the multiple magazines and shell casings submitted to her in relation to this case. She testified that the .22 caliber shell casing "from [] East Third Street" had been fired out of the Kel-Tec pistol found in the Defendant's vehicle.

On cross-examination, Agent Hudson agreed that firearms identification was "completely subjective" and that the procedure for matching ammunition to a specific firearm was based on "sufficient agreement." She agreed that her area of expertise had been criticized for its lack of scientific method.

At this point in the proceedings, the trial court instructed the jury that the victim had been lawfully subpoenaed to appear in court to testify and had elected not to appear.

Travia McDade testified that she was the Defendant's girlfriend. She stated that he came from a good family and was not a violent person but a gentle and loving one.

Based on this evidence, the jury convicted the Defendant of attempted second degree murder, aggravated assault, and reckless endangerment. The trial court imposed sentences of nine, three, and two years for each sentence, respectively.

## C. Motion for New Trial

The Defendant filed a timely motion for new trial and a hearing was held at which the following evidence was presented: the victim, Kadarius Johnson, testified that he remembered being shot on September 23, 2015, but that he did not know who shot him. The victim did not remember seeing a white SUV or giving a description of the shooter to the police. He did not remember speaking to police officers or a police interview. The victim stated that he knew he was subpoenaed to testify at the Defendant's trial but that he did not comply because the Defendant "ain't had nothing to do with [the shooting]." The victim denied knowing the Defendant. He stated that he was "one thousand percent certain" that it was not the Defendant who shot him. The victim agreed that he had been shot in the back of the head.

The Defendant played a recorded statement given by the victim. The audio is difficult to hear, but the victim clearly stated that he did not know who shot him. The Defendant argued that this was exculpatory evidence that should have been turned over to the defense by the State prior to trial and that the State's failure to do so resulted in a violation of *Brady v. Maryland*.

At the conclusion of the hearing, the trial court acquitted the Defendant of aggravated assault, in its capacity at 13th juror, based on a lack of proof of serious bodily

12

injury. With regard to the Defendant's contention that he should have been permitted to explore the alternate perpetrator theory, the trial court stated that the evidence was irrelevant because "there was simply no proof that the gang involvement had anything to do with [the shooting], nor an alternate perpetrator." In regard to the unavailability of the victim, the trial court stated that, based on the victim's hearing testimony that he was not going to testify at trial and the State's efforts to bring him to court, it was appropriate that his preliminary hearing testimony was admitted. The trial court addressed the Defendant's issue with the racial makeup of the jury venire and concluded that there was no proof that any demographic had been systematically excluded from the jury venire.

Regarding the Defendant's issue that Agent Hudson should not have qualified as an expert, the trial court stated that the issue turned on her individual proficiency in her field of expertise and it concluded that she was proficient. Finally, the trial court addressed the admission of the victim's recorded statement, concluding that the State had not withheld it intentionally and that the statement was not of an exculpatory nature sufficient to deprive the Defendant of a fair trial. On the Defendant's motion, the trial court reduced his sentence for the attempted second degree murder conviction from nine years to eight years. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the jury venire did not represent a cross-section of Hamilton County; (2) the trial court erred when it denied his motion for new trial based on newly discovered evidence that would have resulted in a different verdict; (3) the trial court erred in declaring the victim unavailable; (4) the trial court erred when it limited the proof of the victim's gang affiliation, which the Defendant contends presents the likelihood of an alternate perpetrator; (5) Agent Hudson was not qualified as an expert; and (6) the trial court erred when it allowed the victim's prior statement to Investigator Hamilton describing the shooter to be admitted. The State responds that (1) the jury was selected from a fair cross-section of the community; (2) the trial court did not abuse its discretion when it denied the Defendant's motion for new trial; (3) the trial court properly admitted the victim's preliminary hearing testimony based on the victim's unavailability; (4) the trial court properly excluded evidence of the victim's gang affiliation; (5) the trial court properly allowed Agent Hudson to testify as an expert; and (6) the trial court properly admitted the victim's statement in the hospital to Investigator Hamilton.

## A. Jury Venire

The Defendant contends that the jury venire in this case did not comprise a fair cross-section of his community. He specifically argues that of the fifty-five people in the

jury venire, none were African-American male and only three were African-American female. He further argues that only one individual in the jury venire resided in the Defendant's zip code. The Defendant complains that African-American males are systematically excluded from jury trials in Hamilton County because the court system summons citizens for jury duty through their driver license database and African-Americans are less likely to have a license. The State responds that the Defendant has not met his burden of proof as required by the federal courts in *Duren v. Missouri*, 439 U.S. 357, 364 (1979). We agree with the State.

In *Duren*, the United States Supreme Court set forth a three-pronged test for determining whether a jury was properly selected from a fair cross-section of the community pursuant to the Sixth and Fourteenth Amendments. To establish a prima facie violation of the fair cross-section requirement, a defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process. *Duren*, 439 U.S. at 363.

The Defendant argues that a "distinctive group," African-American males, was seemingly not represented in the jury venire, and that, given the alleged 30% African-American population in Chattanooga, that would not be a fair and reasonable representation of the group. The State argues, and we agree, that the Defendant has not proven that this underrepresentation was due to the "systematic exclusion" of the group during the selection process. Other than the assertion that the use of the driver's license registry for random selection of potential jurors excludes African-Americans, who the Defendant contends are less likely to have registered driver's licenses, the Defendant has not provided any evidence of systematic exclusion by the State, resulting in the underrepresentation of African-American males in the jury venire. Accordingly, the Defendant has failed to establish a prima facie violation of the right to have a jury selected from a representative cross-section of the community. The Defendant is not entitled to relief as to this issue.

### B. Motion for New Trial Based on Newly Discovered Evidence

The Defendant next contends that the trial court erred when it denied his motion for new trial based on the submission of newly discovered evidence in the form of the victim's recorded interview denying knowledge of who shot him and the victim's testimony at the motion for new trial hearing denying that it was the Defendant who shot him. The State responds that the record supports the trial court's denial because the Defendant did not provide evidence of his due diligence to procure the victim at trial and because the

Defendant has not shown how the newly discovered evidence would have resulted in a different verdict. The State further contends that in light of the "minimal impact" of the victim's recorded statement, combined with the "evasive nature" of the victim's testimony at the hearing and the strong circumstantial evidence implicating the Defendant as the shooter, the trial court acted within its sound discretion when it denied the Defendant's motion. We agree with the State.

The granting of a motion for new trial lies within the sound discretion of the trial court. When the trial court has denied a motion for new trial based upon newly discovered evidence, that decision may not be disturbed on appeal unless there is an abuse of discretion. *State v. O'Guinn*, 641 S.W.2d 894 (Tenn. Crim. App. 1982). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). A new trial is a matter of right only when the defendant establishes (1) reasonable diligence in seeking newly discovered evidence, (2) the materiality of the evidence, and (3) that the new evidence is likely to change the result of the trial to one more favorable for the defendant. *State v. Bowers*, 77 S.W.3d 776, 784 (Tenn. Crim. App. 2001) (citing *State v. Singleton*, 853 S.W.2d 490, 496 (Tenn. 1993)). When newly discovered evidence merely tends to contradict or impeach the trial evidence, a new trial is not always warranted. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). On appeal, our standard of review is abuse of discretion. *State v. Meade*, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996).

In our view, there has been no abuse of discretion in this instance. While the victim's statement is clearly material, the trial court determined that it was not exculpatory such that it would have affected the outcome of the verdict. It reached a similar conclusion based on the victim's testimony at the hearing, in light of the strong circumstantial evidence linking the Defendant to the shooting. We conclude that the trial court did not abuse its discretion. The Defendant is not entitled to relief.

### C. Victim's Unavailability

The Defendant next contends that the trial court erred when it found the victim "unavailable" because the State did not meet its burden of making a good faith effort to bring the victim to trial. Thus, he contends, the trial court erred when it admitted the victim's preliminary hearing testimony. The State responds that the record supports the trial court's determination that the victim was an unavailable witness and did not err when

15

it admitted the victim's prior testimony.   We agree with the State.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."   Tenn. R. Evid. 801(c).   Hearsay is not admissible unless admission is authorized by the evidence rules or by other controlling provisions of law.   *Id.* at 802.   Tennessee Rules of Evidence 803 and 804 list the exceptions to this general rule of inadmissibility.   One such exception is for former testimony.   Tenn. R. Evid. at 804(b)(1).   It provides as follows:

> The following [is] not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (1) Former Testimony.   Testimony given as a witness at another hearing of the same or a different proceeding or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination.

Tenn. R. Evid. 804.   As relevant to this appeal, the requirements for unavailability are met when a witness "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so."   Tenn. R. Evid. 804(a)(2). "A preliminary hearing transcript is precisely the type of former testimony contemplated under [Rule 804(b)(1)]."   *State v. Bowman*, 327 S.W.3d 69, 88-89 (Tenn. Crim. App. 2009) (concluding that the witness's preliminary testimony was "admissible under the 'former testimony' hearsay exception of Rule 804(b)(1) and . . . did not violate the defendant's rights under the Confrontation Clause") (internal quotations omitted).

The Sixth Amendment of the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"   U.S. Const. amend. VI.   The Tennessee Constitution provides the corresponding right "to meet witnesses face to face."   Tenn. Const. art. I, § 9.   In order to protect a defendant's right to confrontation, before the prior testimony of a witness will be admitted, the State must show that (1) the witness is unavailable and (2) the defendant had a prior opportunity to cross-examine the witness.   *See State v. Maclin*, 183 S.W.3d 335, 351 (Tenn. 2006) (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)).

A panel of this court in *State v. Michael James Grubb*, succinctly addressed this issue, reaching the same conclusion as that in *Bowman*:

> The "purpose of a preliminary hearing is . . . to determine whether there exists probable cause to believe that a crime has been committed and that the

accused committed the crime." *State v. Lee*, 693 S.W.2d 361, 363 (Tenn. Crim. App. 1985). The difference in the standard of proof not-withstanding, the basic purpose of the preliminary hearing and the trial are not "totally separate" . . . , but rather deal with precisely the same issue: whether or not the accused is guilty of the crimes for which he or she is charged. *See State v. Howell*, 868 S.W.2d 23 8, 251 (Tenn. 1993) (holding that a preliminary hearing testimony of a declarant could be introduced at trial under the former testimony exception based primarily on a finding that "at both the [preliminary] hearing and the subsequent trial, the testimony was addressed to the same issue of '[w]hether or not the defendant[ ] had committed the offense' charged."). Accordingly, we conclude that the [d]efendant in this case had the opportunity to cross-examine Officer Beyer at the preliminary hearing with the same motives that would have guided his cross-examination of the declarant had he been available at trial. *See State v. Brian Eric McGowen*, No. M2004-00109-CCA-R3-CD, 2005 WL 2008183, at \*11 (Tenn. Crim. App., Nashville, Aug. 18, 2005) (holding that the trial court did not err in allowing preliminary hearing testimony to be introduced at trial under the former testimony exception because the motive to cross-examine the defendant was the same at both the preliminary hearing and trial). Thus, Crawford's cross-examination requirement was met in this case.

*State v. Michael James Grubb*, No. E2005-01555-CCA-R3-CD, 2006 WL 1005136, at \*15 (Tenn. Crim. App., at Knoxville, Apr. 18, 2006).

As in *Grubb* and *Bowman*, we also conclude that the Defendant's motive for cross-examining the victim at the preliminary hearing was "similar" to the motive for cross-examining him at trial: to negate the Defendant's culpability for the offense charged. The Defendant's attorney asked the victim questions about the time period leading up to the shooting and when and where the shooting occurred. The victim's testimony about the events was virtually the same at the preliminary hearing as it was at the motion for new trial hearing: he provided a physical description of the shooter, had no knowledge of the Defendant and did not know who shot him. The victim's testimony qualifies as "former testimony" and was admissible under Rule 804(b)(2). The record clearly shows that the victim was "unavailable" at trial, after the State used multiple avenues to bring him to court and the victim admitted he did not plan to comply. The Defendant had a similar motive to develop the testimony at the preliminary hearing as he would have had at trial, and the preliminary hearing cross-examination was sufficient to meet the confrontation requirements of *Crawford*. The Defendant is not entitled to relief on this issue.

**D. Victim's Gang Affiliation**

17

The Defendant next contends that the trial court erred when it limited his ability to introduce evidence or cross-examine witnesses about the victim's gang affiliation in support of the defense theory of an alternate perpetrator.   The State responds that the trial court properly limited the introduction of this evidence, based on its conclusion that there was no relevant evidence sought to be presented.   We agree with the State.

"Admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion."   *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004).   The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority.   Tenn. R. Evid. 402.   Of course, "[e]vidence which is not relevant is not admissible."   *Id.*   Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."   Tenn. R. Evid. 401.   Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."   Tenn. R. Evid. at 403.

In the present case, the Defendant sought to introduce evidence of the victim's gang affiliation in order to establish his theory that, as part of an ongoing gang war, a third party had shot the victim.   The trial court heard testimony and argument in a pretrial hearing and at other points during the trial and allowed the Defendant to present, outside the presence of the jury, all the evidence he had to show that someone other than the Defendant was the shooter.   Ultimately, the trial court concluded that there was no evidence other than speculative testimony that the victim's alleged gang ties were at the root of the shooting. The trial court concluded that it would not allow the Defendant to present evidence of the victim's gang ties because they were not relevant and did not make any fact already in evidence more or less likely to be true.

As required, the trial court held a jury-out hearing, considered the relevant factors, and concluded that the evidence sought to be introduced was not relevant and was based on a purely speculative theory.   The trial court expressed its willingness to allow the Defendant to present any facts to support his assertion and concluded that none existed. We agree with the trial court that the testimony presented established only that the victim was a known gang member.   The evidence did not establish that a third party was responsible for the shooting and did not prove a third-party motive for harming the victim. Any testimony suggesting that the victim's gang ties were the cause of the shooting, without further explanation, would have likely confused the jury.   Accordingly, we conclude that the trial court did not abuse its discretion when it denied the Defendant's

18

request to present evidence on this subject. The Defendant is not entitled to relief as to this issue.

## E. Agent Hudson

The Defendant next contends that the trial court erred when it qualified Agent Hudson as an expert witness. He challenges the field of firearms identification and states that Agent Hudson's testimony that the .22 caliber shell was fired from the gun found in the Defendant's vehicle was misleading and unsubstantiated. The States responds that the record supports the trial court's decision to qualify Agent Hudson as an expert based on her education, training, and proficiency in the area of firearms identification. We agree with the State.

Generally, expert testimony is necessary when the subject matter requires that the court and jury have the aid of knowledge or experience not held by ordinary witnesses, *Lawrence County Bank v. Riddle*, 621 S.W.2d 735, 737 (Tenn. 1981), and where common knowledge furnishes no criteria for judgment or where proof depends on observation and analysis outside the common experience of jurors, expert testimony is required to establish the proof. This court has cited the following from American Jurisprudence:

> A jury . . . is often confronted with issues which require scientific or specialized knowledge or experience in order to be properly understood, and which are not subject to an intelligent determination simply on the basis of deductions made and inferences drawn from ordinary knowledge, common sense, and practical experience gained in the ordinary affairs of life. . . . On such issues, the testimony of a witness with special knowledge and skill is required in order to arrive at an intelligent conclusion.

*Id.* (citing 31A Am.Jur.2d § 32 (1989)). Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court. *See State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002) (citing *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257, 263–64 (Tenn. 1997); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993)). On appellate review, the trial court's ruling shall not be overturned absent a finding that the trial court abused its discretion in admitting or excluding the expert testimony. *Id.* (citing *Ballard*, 855 S.W.2d at 562). "[A]n appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Id.* (citing *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)).

In the case under submission, the Defendant's objection to expert witness Agent

19

Hudson's testimony is that her area of expertise, firearms identification, is an area that has come under scrutiny and is rooted in subjectivity.  We note that the Defendant explored this topic with Agent Hudson on cross-examination, and the jury heard her testimony regarding the subjective nature of her findings.  Agent Hudson fully explained the procedure and methodology involved in making her determination, and the Defendant conducted a lengthy cross-examination of her regarding her findings.

The trial court found that Agent Hudson was qualified to testify as an expert based on her training and proficiency in the field of firearm identification, and based on her history of testifying as an expert.  The evidence supports its finding that Agent Hudson was competent and would present relevant testimony regarding the ammunition and firearm connected to this case which would aid the jury of laypersons in their understanding of the evidence.  We conclude that the trial court did not abuse its discretion in allowing Agent Hudson to testify as an expert.  The Defendant is not entitled to relief as to this issue.

### F. Victim's Statement to Investigator Hamilton

The Defendant lastly contends that the victim's statement made in the hospital to Investigator Hamilton that a black man with dreads had shot him was inadmissible hearsay because the victim did not testify and was never subject to cross-examination about the statement as required pursuant to the hearsay exception found at Tennessee Rule of Evidence 803(1.1) (allowing the admission of an out-of-court "statement of identification of a person made after perceiving the person if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement.").  The State responds that the trial court properly admitted this evidence because the Defendant "opened the door" to this evidence.  We agree with the State.

A panel of this court addressed the concept of allowing otherwise inadmissible evidence be admitted pursuant to the doctrine of curative inadmissibility, or "opening the door":

> "[A] hearsay statement becomes admissible when "the defendant himself both elicited and opened the door to the testimony." *State v. Robinson*, 146 S.W.3d 469, 493 (Tenn. 2004) (concluding that there was no error admitting hearsay evidence that a declarant identified the defendant when the defense elicited the testimony).  "'[O]pening the door' is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence." *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012).  This doctrine, also called curative admissibility, "provides that '[w]here a defendant has injected an issue into

20

the case, the State may be allowed to admit otherwise inadmiss[i]ble evidence in order to explain or counteract a negative inference raised by the issue defendant injects.'" *State v. Land*, 34 S.W.3d 516, 531 (Tenn. Crim. App. 2000) (quoting *State v. Armentrout*, 8 S.W.3d 99, 111 (Mo. 1999)); *see also State v. Bennie Edward Jackson*, No. M2016-02575-CCA-R3-CD, 2017 WL 4457597, at *7 (Tenn. Crim. App. Oct. 5, 2017) (noting that a witness's testimony regarding prior assaults was elicited by the defense and that the defense did not request curative instructions), *perm. app. denied* (Tenn. Feb. 14, 2018). In order to "open the door," the party against whom the evidence is offered must introduce the matter or put the matter at issue. *Gomez*, 367 S.W.3d at 246. The evidence admitted must be relevant to the same subject matter as the evidence introduced by the party against whom it is offered. *Id.* at 247-48.

*State v. Antoine Dewayne Clark*, No. M2017-02525-CCA-R3-CD, 2019 WL 410705, at *10 (Tenn. Crim. App., at Nashville, Jan. 31, 2019), *no perm. app. filed*.

The State contends that the Defendant opened the door to the victim's physical description of the Defendant when his attorney asked Investigator Hamilton whether anyone had identified the Defendant as the shooter. The State sought to refute this question on recross-examination with the victim's statement to Investigator Hamilton that a heavyset black man with dreads was the shooter. The Defendant contends that this was a description of the shooter, not an identification sufficient to bring the statement under the umbrella of the Rule 803(1.1) hearsay exception; he further contends that asking Investigator Hamilton if an identification was made of the shooter did not "open the door" for the introduction of a prior out-of-court statement by the victim describing the shooter's physical characteristics.

Our supreme court has commented that "the concept of 'opening the door' [to allow for the admission of evidence] is 'notoriously imprecise,'" *See Gomez*, 367 S.W.3d at 246 (citing 21 Charles Alan Wright et al., *Federal Practice & Procedure Evidence* § 5039), describing it as "an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence." *Id.* Common examples are if evidence of prior bad acts of a defendant are inadmissible, the defendant may open the door to admission of that evidence by putting his character at issue. *Id.* (citing Tenn. R. Evid. 404(a)(1), (2); *see also* Tenn. R. Evid. 405(a)). A party may also "open the door" to evidence of a witness's truthful character by attacking the reputation of a witness for truthfulness. *Id.* at 246 (citing Tenn. R. Evid. 608(a)).

We begin by noting that Tenn. R. Evid. 803(1.1) does not apply in this particular case because that rule allows the admission of prior statements of identification of a person

if the declarant testifies at the trial or hearing and is subject to cross-examination regarding the identification statement. The declarant of the statement here, the victim, did not testify and thus this hearsay exception does not apply. We conclude that the trial court did not abuse its discretion when it concluded that the Defendant had "opened the door" to the victim's physical description of the shooter by asking whether anyone had identified the shooter. The State points out, and we agree, that this question insinuated that the Defendant had been wrongfully charged because no one had identified him when, in fact, the victim had made the statement that an individual matching the Defendant's exact description had shot him. The victim's statement was "necessary to dispel" the insinuation that the Defendant was a random individual stopped by police and later charged as the shooter, a theory the Defendant sought to perpetuate at trial. Accordingly, the trial court properly allowed the State to introduce the victim's physical description to refute this notion. Accordingly, the Defendant is not entitled to relief.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

22